836 A.2d 42

**Joan MELVIN, Appellee**

**v.**

**John DOE, Allen Doe, Bruce Doe, Carl Doe, David Doe, Edward Doe, Frank Doe, George Doe, Harry Doe, Irving Doe, Kevin Doe, Larry Doe, and Jane Doe, Appellants.**

Supreme Court of Pennsylvania.

Argued March 3, 2003.

Decided Nov. 19, 2003.

266

Ann Beeson, Pro Hac Vice; Ronald D. Barber, Witold J. Walczak, Pittsburgh, for appellants

John Andrew Valentine, for appellant amicus curiae, America Online, Inc.

John R. Orie, Robert O. Lampl, Pittsburgh, for appellee, Joan Melvin.

Before: CAPPY, C.J., and CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and LAMB, JJ.

## OPINION

Justice LAMB.

In this appeal, we are asked to review the Superior Court's refusal to overturn the order of the Allegheny County Court of Common Pleas forcing Appellants, John Doe et al., to reveal their identities to Appellee, Joan Melvin.

Appellee, a former Allegheny County Court of Common Pleas Judge, has been a Pennsylvania Superior Court Judge since November of 1997. In early 1999, Appellants, via a service provided by America Online, published a statement about Appellee on an Internet webpage known as "Grant Street '99". The statements posted on the webpage included allegations that Appellee had engaged in "misconduct" by lobbying the Ridge administration[1] for the appointment of a particular attorney to an upcoming vacancy on the Allegheny County Court of Common Pleas.

After becoming aware of the statements posted on the website, Appellee commenced a defamation action in Allegheny County. Thereafter, Appellee propounded discovery seeking Appellants' identities. Appellants filed a motion for a protective order, as well as a motion for summary judgment, alleging that they enjoy a First Amendment[2] right to engage in anonymous political criticism, and that the court, in order to protect that right, should require Appellee, a public official defamation plaintiff, to prove actual economic harm prior to obtaining discovery of Appellants' identities. The trial court denied Appellants' motion for summary judgment because

1. Referring to the Administration of Former Pennsylvania Governor Tom Ridge, who served as Governor from 1995 until October of 2001.

2. U.S. Const. amend. I.

Appellee had produced evidence that would support Appellee's claim as a matter of law.  The trial court denied Appellants' motion for a protective order and ordered that Appellants reveal their identities subject to a confidentiality order.[3]

Appellants filed an appeal from the trial court's order with the Superior Court.  Appellee filed a motion to quash, which the Superior Court granted.  The Superior Court held that the order denying Appellants' motion for summary judgment was not a collateral order subject to immediate appellate review under Pa.R.A.P. 313.  *Melvin v. Doe*, 789 A.2d 696, 698 (Pa.Super.2001).[4]  In so concluding, the Superior Court stated that "Appellants' motion for summary judgment cannot be considered a collateral order, since it clearly is not separable and collateral from the action where it had the potential to decide one or more issues in the case." *Id.* (citing *Pace v. Thomas Jefferson University Hospital*, 717 A.2d 539 (Pa.Super.1998)).  We agree with the Superior Court that the denial of the motion for summary judgment would not qualify as a collateral order.  Therefore, the Superior Court was correct in quashing Appellants' appeal from the trial court's denial of their motion for summary judgment.

The Superior Court also held that the trial court's order directing Appellants to disclose their identities was not a collateral order under Pa.R.A.P. 313 as it "directly relates to and is intertwined with the actual claim, and thus cannot be

3.  Specifically, the trial court ordered that:
    (1) except as provided for in paragraph (2), defendants' motion for a protective order is denied;  and
    (2) discovery related to the identity of the defendants shall be subject to a confidentiality order, which the parties shall prepare, consistent with the Opinion which accompanies this court order.
    In its opinion, the trial court stated that "until further order of court discovery responses involving the identity of the publisher will be made available only to the parties and their counsel and will not be disclosed to any third party."  Trial ct. slip op., p. 31 (footnote omitted).

4.  We also note that the order does not qualify as a final order under Pa.R.A.P. 341, as an order denying a motion for summary judgment does not terminate the litigation, and thus is not an appealable order. *Pennsylvania Turnpike Commission v. Atlantic Richfield Co.*, 482 Pa. 615, 394 A.2d 491, 494 (1978);  *see also* Pa.R.A.P. 341.

considered collateral." *Melvin,* 789 A.2d at 699. Reargument was denied on Jan. 31, 2002. For the reasons set forth below, we disagree with the Superior Court's determination that the trial court's discovery order was not collateral, and we reverse the order quashing Appellant's appeal therefrom.

■ As discussed *infra,* under the collateral order doctrine,[5] Appellants, in seeking to protect their First Amendment rights, were entitled to appellate review of the trial court's order requiring disclosure of Appellants' identities.[6] Pennsylvania Rule of Appellate Procedure 313 states:

(a) General Rule. An appeal may be taken as of right from a collateral order of an administrative agency or lower court.

(b) Definition. A collateral order is an order separable from and collateral to the main cause of action where the right involved is too important to be denied review and the question presented is such that if review is postponed until final judgment in the case, the claim will be irreparably lost.

Pa.R.A.P. 313.

This Court recently discussed the collateral order doctrine in *Ben v. Schwartz,* 556 Pa. 475, 729 A.2d 547 (1999). In *Schwartz,* we addressed the issue of whether a trial court order compelling the Bureau of Professional and Occupational Affairs to produce its investigative file in connection with a dental malpractice action was appealable under the collateral order doctrine. Similar to the action of Appellants in the instant case, the bureau filed a motion for a protective order claiming, *inter alia,* that the investigative file was privileged and thus not subject to discovery.[7]

---

5. The phrase collateral order doctrine is used because the statute is the codification of case law, and therefore derives its commonly used name from case law which preexisted the collateral order statute, which was enacted in 1992.

6. We do not hold, however, that the allegation of a constitutional violation automatically transforms an otherwise interlocutory order into a collateral and thus appealable order. Rather, this holding is limited to cases like that here presented involving a significant constitutional question.

7. In particular, the bureau asserted the government/executive privilege as well as a privilege under the Right to Know Law, 65 P.S. § 66.1 *et seq.*

A crucial issue in *Schwartz* was the separability prong of the collateral order doctrine. Specifically, the Bureau argued that a determination of the issue of privilege was separate and distinct from the underlying cause of action, even where discovery of the allegedly privileged information was sought precisely because it would shed light on the underlying malpractice claim. In support of its argument on separability, the Bureau cited the decision of the United States Court of Appeals for the Third Circuit in *In re Ford Motor Co.*, 110 F.3d 954 (3d Cir.1997), in which the appellate court held to be an appealable, collateral order, the trial courts refusal to protect as attorney work product or under the attorney-client privilege, certain internal corporate documents pertinent to the Bronco II product liability litigation. *Schwartz*, 729 A.2d at 551. In *Schwartz*, we held:

> As in *Ford Motor*, the issues of privilege raised by the Bureau can be addressed without analysis of the alleged negligence of the dentists in treating Ewa Ben. We find, therefore, that the Bureau has demonstrated that the issue of privilege is separate from the merits of the dispute for purposes of the collateral order doctrine.

*Id.*

In the instant case, Appellee argues that the trial court's discovery order cannot be considered a collateral order because it is "intertwined closely and inseparabl[y] with the merits of Appellee's defamation claim." Appellee's Brief, p. 20. We disagree with Appellee's argument based on *Schwartz*, where this Court unanimously concluded that the *Ford Motor* concept of separability is more practical in its application than the standard articulated by the Commonwealth Court in *Doe v. Commonwealth of Pennsylvania, Department of Public Welfare*, 105 Pa.Cmwlth. 482, 524 A.2d 1063 (1987), which prior to *Schwartz*, was a leading case on the subject.

The Superior Court held that it could not review the discovery order because it "may only be considered collateral where the material subject to discovery is not intertwined with the facts necessary to support the cause of action." *Melvin*, 789

A.2d at 698. Thus, the Superior Court has returned the analysis of separability to the *substance* of the information sought by discovery, precisely the analytic method we rejected in *Schwartz.* It is true that Appellants' identities are needed to evaluate the actual malice portion [8] of Appellee's burden of proof. However, it cannot be said that review of Appellants' instant claim relating to the trial court's discovery order requires consideration of the *merits* of the underlying defamation action.

Appellants claim that they enjoy a First Amendment right to engage in anonymous political speech and that the trial court failed to adequately protect that right by requiring Appellee to prove actual economic harm as a prerequisite to disclosure of their identities in discovery. The main cause of action is a defamation claim based on the allegedly defamatory statements made about Appellee. Appellate review of the constitutionality of the discovery order is not directly related to or impermissibly intertwined with the resolution of the underlying defamation claim. Consideration of whether a harmful defamatory statement was made (i.e., publication, falsity, defamatory meaning, actual malice, and actual harm) is

**8.** In *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court of the United States held that the guarantees of the First Amendment to the United States Constitution require a rule that a public official cannot recover damages for a defamatory falsehood that relates to official conduct unless the official proves that the statement was made with actual malice, that is with knowledge that the statement was false or with reckless disregard as to whether it was false. *New York Times,* 376 U.S. at 279–80, 84 S.Ct. 710. Therefore, *New York Times* stands for the principle that the First Amendment protects speech aimed at public officials by prohibiting damages for such statements, even if false, unless made with actual malice. The rule is premised on the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times,* 376 U.S. at 270–71, 84 S.Ct. 710 (citing *Terminiello v. Chicago,* 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131 (1949); *De Jonge v. Oregon,* 299 U.S. 353, 365, 57 S.Ct. 255, 81 L.Ed. 278 (1937)). The rule articulated in *New York Times* creates a privilege for criticism of official conduct by requiring a public official suing for defamation to prove actual malice and thereby quells the fear of damages for open criticism of public officials. *See New York Times,* 376 U.S. at 269, 277, 84 S.Ct. 710.

not necessary. Rather, the issue Appellants sought to present to the Superior Court was strictly a legal one, entailing consideration of what threshold requirements must be imposed as a prerequisite to discovery in an anonymous defamation case in order to implement essential First Amendment protections. Such inquiry is plainly separable from the defamation action.

However, this Court is committed to preventing the erosion of the principle behind the collateral order doctrine. As we explained in *Geniviva v. Frisk*, 555 Pa. 589, 725 A.2d 1209, 1214 (1999), the collateral order doctrine is a specialized, practical application of the general rule that only final orders are appealable as of right. Thus, Rule 313 must be interpreted narrowly, and the requirements for an appealable collateral order remain stringent in order to prevent undue corrosion of the final order rule. *See Geniviva*, 725 A.2d at 1214. To that end, each prong of the collateral order doctrine must be clearly present before an order may be considered collateral. Therefore, we must also give critical attention to the remaining criteria of whether the trial court's discovery order directly affects a right that is too important to be denied review and whether the question presented is such that if review is postponed until final judgment in the case, the claim will be irreparably lost.

As we stated in *Geniviva*, "[f]or purposes of defining an order as a collateral order under Rule 313, it is not sufficient that the issue be important to the particular parties. Rather it must involve rights deeply rooted in public policy going beyond the particular litigation at hand." *Geniviva*, 725 A.2d at 1213–14. Appellants assert that the First Amendment protects anonymous political speech, and that the courts, in order to protect that right, should require a public official defamation plaintiff to establish economic harm prior to obtaining discovery of an anonymous defamation defendant's identity. The importance of protecting against government infringement upon the rights afforded by the First Amend-

ment to the United States Constitution[9] is unquestionable. In order to determine whether the issue raised by Appellants meets the importance prong of the collateral order doctrine, we must determine whether the discovery order directly affects a right that is too important to be denied review.

The United States Supreme Court has found that the First Amendment does indeed protect, in some cases, the right to speak anonymously. The Court made such a conclusion in *Talley v. California*, 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960). In *Talley*, the petitioner had distributed handbills in violation of the Municipal Code of the City of Los Angeles, which provided in pertinent part that "[n]o person shall distribute any hand-bill in any place under any circumstances, which does not have printed on the cover ... the name and address of ... [t]he person who printed, wrote, compiled or manufactured the same." *Talley*, 362 U.S. at 60–61, 80 S.Ct. 536 (quoting Section 28.06 of the Municipal Code of the City of Los Angeles). The handbills that petitioner had distributed in Los Angeles urged readers to help a consumer organization carry out a boycott against businesspersons whom the organization believed supported manufacturers that did not offer equal employment opportunities to various ethnic groups. *Id.*, 362 U.S. at 61, 80 S.Ct. 536. The petitioner alleged that the ordinance invaded his freedom of speech and of press in violation of the First and Fourteenth Amendments to the United States Constitution. *Id.* at 62, 80 S.Ct. 536. The Court found that the ordinance was overly broad in that it barred all handbills that did not have printed thereon the names and addresses of the persons who prepared, distributed or sponsored them. *Id.* at 64–65, 80 S.Ct. 536. Thus, the Court held that the ordinance was void on its face, noting that

9. Appellants do not raise a claim under Article 1, Section 7 of the Pennsylvania Constitution, but we note that this Court "has repeatedly determined that Article I, § 7 affords greater protection to speech and conduct in this Commonwealth than does its federal counterpart, the First Amendment." *Pap's A.M. t/d/b/a Kandyland v. City of Erie*, 553 Pa. 348, 719 A.2d 273, 283 (1998) (Castille, J., concurring, joined by Zappala, J.) (listing cases), *rev'd and remanded* (on federal constitutional grounds), 529 U.S. 277, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000). However, having not been raised, that issue is waived.

"there are times and circumstances when States may not compel members of groups engaged in the dissemination of ideas to be publicly identified." *Id.* at 65, 80 S.Ct. 536 (citing *Bates v. City of Little Rock,* 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960); *N.A.A.C.P. v. State of Alabama,* 357 U.S. 449, 462, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) (the reasoning of such holdings being that identification and fear of reprisal might deter otherwise peaceful discussions of public matters of importance)).

Recently, in *McIntyre v. Ohio Elections Commission,* 514 U.S. 334, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995), the Court again ruled on the constitutional implications of anonymous pamphleteering. In *McIntyre,* the Court addressed whether an Ohio statute that prohibited the distribution of anonymous campaign literature abridged the freedom of speech within the meaning of the First Amendment. *McIntyre v. Ohio Elections Commission,* 514 U.S. 334, 336, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995). McIntyre distributed leaflets to persons attending a public meeting in order to raise opposition to a proposed school tax levy. While some of the handbills identified McIntyre as the author, others did not. A school official filed a complaint with the Ohio Elections Commission alleging that McIntyre's distribution of unsigned leaflets violated the Ohio election law. The commission agreed and fined McIntyre $100. Finding in favor of McIntyre, the United States Supreme Court cited its decision in *Talley* from thirty-five years earlier: "[a]nonymous pamphlets, leaflets, brochures and even books have played an important role in the progress of mankind." *McIntyre,* 514 U.S. at 341, 115 S.Ct. 1511 (citing *Talley,* 362 U.S. at 64, 80 S.Ct. 536). The Court stated unequivocally that an author's decision to remain anonymous is protected by the First Amendment.[10] *Id.* at 342, 115 S.Ct. 1511. Emphasizing this right as applied to political debate, the Court stated: "even in the field of political rhetoric, where 'the identity of the speaker is an important component of

**10.** The United State Supreme Court even more recently so held in *Watchtower Bible and Tract Society of New York, Inc. v. Village of Stratton et al.,* 536 U.S. 150, 122 S.Ct. 2080, 153 L.Ed.2d 205 (2002).

many attempts to persuade,' the most effective advocates have sometimes opted for anonymity." *Id.* at 342–43, 115 S.Ct. 1511 (quoting *City of Ladue v. Gilleo*, 512 U.S. 43, 56, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994) (footnote omitted)). The Court concluded that Ohio did not show that its interest in preventing the misuse of anonymous election-related speech justified a blanket prohibition of that speech. *Id.* at 357, 115 S.Ct. 1511. But the Court recognized that the legislation deemed unconstitutional in *Talley* and in *McIntyre* was not aimed at providing a way to identify those responsible for evils such as fraud, false advertising, or libel, and, therefore, could not be excused as a justifiable means to prevent the dissemination of untruths. *McIntyre*, 514 U.S. at 344, 115 S.Ct. 1511.

More than fifty-five years before *McIntyre* was decided, in *Schneider v. State of New Jersey (Town of Irvington)*, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939), the United States Supreme Court addressed four cases, each of which presented the question of whether regulations embodied in a municipal ordinance abridged the freedom of speech and of the press secured against state invasion by the Fourteenth Amendment to the Constitution. Three of the four consolidated cases involved ordinances that prohibited in some way the distribution of handbills. In those three cases, the purpose of the ordinances was to protect the appearance of the streets by keeping them free of unnecessary litter. The Supreme Court concluded that such a purpose was insufficient to justify ordinances that prohibited persons rightfully on a public street from handing literature to those willing to receive it. *Schneider*, 308 U.S. at 162, 60 S.Ct. 146. In so finding however, the Court recognized that certain interests could justify some regulation of speech without infringing upon protected First Amendment rights:

For example, a person could not exercise this liberty by taking his stand in the middle of a crowded street, contrary to traffic regulations, and maintain his position to the stoppage of all traffic; a group of distributors could not insist upon a constitutional right to form a cordon across the street and to allow no pedestrian to pass who did not accept

a tendered leaflet; nor does the guarantee of freedom of speech or of the press deprive a municipality of power to enact regulations against throwing literature broadcast in the streets. Prohibition of such conduct would not abridge the constitutional liberty since such activity bears no necessary relationship to the freedom to speak, write, print or distribute information or opinion.

*Id.* at 160–61, 60 S.Ct. 146.

Thus, while the United States Supreme Court, in applying the First Amendment, has held that there is indeed a right to anonymous free speech, it has also recognized that, with regard to free speech generally, the States have justifiable interests in preventing certain evils. The Court has specifically stated that libel is one of those evils that the States have justifiable interests in guarding against:

The legitimate state interest underlying the law of libel is the compensation of individuals for the harm inflicted on them by defamatory falsehood. We would not lightly require the State to abandon this purpose, for, as Mr. Justice Stewart has reminded us, the individual's right to the protection of his own good name

reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty. The protection of private personality, like the protection of life itself, is left primarily to the individual States under the Ninth and Tenth Amendments. But this does not mean that the right is entitled to any less recognition by this Court as a basic of our constitutional system. *Rosenblatt v. Baer,* 383 U.S. 75, 92, 86 S.Ct. 669, 679, 15 L.Ed.2d 597 (1966) (concurring opinion).

*Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 341, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). In *Gertz,* the Court recognized that there is some tension "between the need for a vigorous and uninhibited press and the legitimate interest in redressing wrongful injury." *Id.* at 342, 94 S.Ct. 2997.

Article I, Section 1 of the Pennsylvania Constitution protects a person's reputation as part of her life, liberty and property. Additionally, the United States Supreme Court has also recognized that the individual's interest in his reputation is a basic concern. *Herbert v. Lando,* 441 U.S. 153, 169, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979). It is important, however, to keep in mind that the United States Supreme Court has stated that neither factual error nor defamatory content suffices to remove the constitutional shield from criticism of official conduct and, that the combination of the two elements is no less inadequate. *New York Times,* 376 U.S. at 273, 84 S.Ct. 710. In *New York Times,* the Court recognized this as a lesson to be drawn from the controversy over the Sedition Act of 1798, 1 Stat. 596, during which Jefferson and Madison strongly objected to the Act. Madison, in his report in support of the protest, noted that "[t]he people, not the government, possess the absolute sovereignty." *New York Times,* 376 U.S. at 273–74, 84 S.Ct. 710. However, these ideals have not been said to prevent the States from effectively protecting even public officials from anonymous defamation, provided that no damages are awarded until after the public official plaintiff has proved actual malice. Additionally, the cases dealing with the right to anonymous free speech have been decided by the United States Supreme Court in the context of regulatory bans on handbills and have not been applied in the area of libel suits against public officials. Despite this contextual disconnect, this Court does not take lightly the importance of anonymous political speech.

In the instant case, Appellants argue that the trial court did not adequately protect their First Amendment right to engage in anonymous political speech, since it directed disclosure of their identities without requiring Appellee to establish actual economic harm. We find that the United States Supreme Court has endorsed that right in certain circumstances. The issue of whether that right protects Appellants' identities in the context of Appellee's defamation claim remains undecided. However, in the context of this case, we find that the court-ordered disclosure of Appellants' identities presents a signifi-

cant possibility of trespass upon their First Amendment rights. There is no question that generally, the constitutional right to anonymous free speech is a right deeply rooted in public policy that goes beyond this particular litigation, and that it falls within the class of rights that are too important to be denied review.

Finally, it is clear that once Appellants' identities are disclosed, their First Amendment claim is irreparably lost as there are no means by which to later cure such disclosure.[11]

For the reasons discussed above, this Court finds that the trial court's discovery order falls within Rule 313, the exception to the final order rule. Since the instant appeal is from the Superior Court's order quashing the appeal of the trial court's discovery order, the Superior Court, having found that the order is not appealable, has not yet addressed the constitutionality of the trial court's order. Therefore, we vacate the Superior Court's order quashing Appellants' appeal and remand this case to the Superior Court for consideration of Appellants' constitutional question, namely, whether the First Amendment requires a public official defamation plaintiff to establish a *prima facie* case of actual economic harm prior to obtaining discovery of an anonymous defamation defendant's identity.

Chief Justice CAPPY files a concurring opinion in which Justices NIGRO and EAKIN join.

Chief Justice CAPPY, concurring.

I agree with the majority's holding that the trial court's order directing Appellants to disclose their identities is a collateral order under Pa.R.A.P. 313(b), and with its decision to remand this case to the Superior Court for resolution of the questions that Appellants have raised. I also agree with the

11. The fact that the trial court's order limits disclosure to Appellee does not prevent Appellants from losing their anonymity. Further, as the trial court acknowledged, "any ruling that does not fully protect the anonymity of the anonymous Internet speaker may deter anonymous Internet speech." Trial ct. slip op., p. 31.

majority's reasoning as to why the first and third prongs of Rule 313(b) are satisfied.

I do not, however, entirely agree with the majority's reasoning as to why the Rule's second prong is met. Specifically, I take issue with the majority's inquiry into whether Appellants "presents a significant possibility of trespass" upon the right that Appellants have asserted. (Majority Opinion at 13). I believe that the majority's inquiry and determination in this regard go to the merits of Appellants' appeal, and should not be part of the Court's present opinion.

In connection with the Rule's second prong, the court is to determine whether "the right involved is too important to be denied review...." Pa.R.A.P. 313(b). As I see it, the right that Appellants claim the trial court's discovery order violates is the right to speak anonymously under the First Amendment. *See Talley v. California,* 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960). Thus, all that the Court should presently consider in connection with the second prong is that right's relative importance.[1]

The majority, however, goes further. On pages 8 through 13, it engages in a preliminary determination as to whether the First Amendment right to anonymous speech applies to Appellants' particular circumstances, as defendants in a defamation case. In doing so, I believe that the majority goes too far. In my view, Pa.R.A.P. 313(b) is a procedural device for identifying those non-final orders that fall within the narrow exception to the general rule that permits appellate review only of final orders, otherwise known as the collateral order doctrine. *See Pugar v. Greco,* 483 Pa. 68, 394 A.2d 542, 545 (1978). It is not a vehicle for any analysis of the substantive questions that the appeal raises.

I find our decision in *Ben v. Schwarz,* 556 Pa. 475, 729 A.2d 547 (1998), instructive. There, the Bureau of Professional and Occupational Affairs ("Bureau") objected to a subpoena of its investigative files pertaining to complaints against a dentist who had been sued for malpractice. The Bureau claimed that

---

1. The majority concludes that it is. I agree.

the information requested was protected by the governmental/executive privilege, the privilege under the Right–to–Know Law, 65 P.S. § 66.1 *et seq.*, and the privacy rights of third parties. The trial court ordered the production. The Bureau filed an immediate appeal under Pa.R.A.P. 313(b), which the Commonwealth Court quashed, concluding that Rule 313(b)'s first prong was not met.

We disagreed, and held that the trial court's discovery order satisfied all three of the Rule's prongs. In connection with the second prong, we weighed the interests implicated in the case against the costs of piecemeal litigation. Because we determined that the privileges the Bureau had raised concerned rights rooted in public policy, we concluded that the Rule's second prong was met. 729 A.2d at 552. In this part of our opinion, we did not consider whether the privileges or other rights the Bureau was asserting actually applied in the circumstances its case presented. Rather, it was later in our opinion, when we moved to the merits of the Bureau's appeal, that we decided whether the Bureau's files were privileged or otherwise protected from disclosure because of the privacy interests of third parties.[2] Ultimately, we rejected the Bureau's claims of privilege and other interests, and held that its files were subject to discovery. *Id.* at 553–54.

Thus, given the terms of Pa.R.A.P. 313(b) and our precedent applying it, I would not in connection with the Rule's second prong, analyze the parameters of Appellants' First Amendment rights, if any, or the lawfulness of the trial court's discovery order. Accordingly, I join the majority opinion, except for those portions of the majority opinion that discuss those matters.

Justice NIGRO and EAKIN join this concurring opinion.

---

**2.** Unlike the present case, we decided to resolve the appeal rather than remand it to the Commonwealth Court. *Id.* at 552–53.