KUWAIT & GULF LINK TRANSPORT COMPANY, KGL Logistics, and KGL Transportation Company KSCC,

v.

John DOE (a.k.a. Scott Wilson), Agility Public Warehousing Company K.S.C. (a.k.a. Agility, f/k/a The Public Warehousing Company), Agility DGS Logistics Services Company K.S.C.C. (f.k.a. PWC Logistic Services Company K.S.C.C.) PWC Transport Company W.L.L., Agility DGS Holdings, Inc. (f.k.a. Agility Defense & Government Services, Inc.), Agility Defense & Government Services, Inc. (f.k.a. Taos Industries, Inc.), Agility International, Inc.

Appeal of Agility DGS Holdings, Inc., Agility Defense Government Services, Inc. and Agility International, Inc.

Kuwait & Gulf Link Transport Company, KGL Logistics, and KGL Transportation Company KSCC,

v.

John Doe (a.k.a. Scott Wilson), Agility Public Warehousing Company K.S.C., Agility DGS Logistics Services Company K.S.C.C., PWC Transport Company W.L.L., Agility DGS Holdings, Inc., Agility Defense and Government Services, Inc., and Agility International, Inc.

Appeal of Agility Public Warehousing Company K.S.C., Agility DGS Logistics Services Company K.S.C.C., and PWC Transport Company W.L.L.

Superior Court of Pennsylvania.

Argued Feb. 25, 2014.
Filed May 6, 2014.

Alan M. Freeman and Allon Kedem, Washington, DC, for appellants.

Clifford J. Zatz, Washington, DC, for Kuwait & Gulf, KGL Logistics and KGL Transportation, appellees.

BEFORE: DONOHUE, STABILE and PLATT *, JJ.

OPINION BY DONOHUE, J.:

Agility Public Warehousing Co. K.S.C. ("PWC"), Agility DGS Logistics Services Co., K.S.C.C., PWC Transport Co., W.L.L., Agility DGS Holdings, Inc., Agility Defense Government Services, Inc., and Agility International, Inc. (collectively "Agility"), and John Doe appeal from the order entered on May 21, 2013 by the Court of Common Pleas of Cumberland County granting the motion of Kuwait & Gulf Link Transport Co., KGL Logistics, and KGL Transportation Co. K.S.C.C. (collectively "KGL") to compel discovery responses by Agility concerning the identity of the sender of the allegedly defamatory letters signed with the pseudonym "Scott Wilson." We vacate the trial court's order and remand with instructions.

The facts and procedural history in this matter are as follows. KGL is a family of Kuwaiti-based companies that provides shipping, transportation, warehousing, and logistics services to the United States Government in Kuwait and Southeast Asia. Agility is a family of logistics companies, including three of their separate, but wholly owned, subsidiaries that competes with KGL for government contracts.

In February 2011, the United States Government's Defense Logistics Agency ("DLA") awarded a contract to KGL to operate a military storage and distribution depot in Kuwait. On March 10, 2011, Intermarkets Global ("Intermarkets"), a company not related to any party in this matter, protested the award of that contract to KGL. KGL alleges that on March 22, 2011 and March 24, 2011, a person under the pseudonym "Scott Wilson" sent two letters ("the Wilson Letters") to contracting officers at the DLA and the United States Army Sustainment Command ("USASC"). The Wilson Letters informed the DLA and the USASC that KGL had violated the Comprehensive Iran Sanctions, Accountability, and Divestment Act ("CISADA") by maintaining business relationships with Iranian entities and urged them to investigate this issue. The Wilson Letters also contained email chains in support of these allegations.

KGL alleges that Intermarkets supplemented its protest of the above-referenced contract with copies of the Wilson Letters, characterizing KGL as an irresponsible contractor. KGL asserts that it sustained losses and costs associated with defending this protest, but that it was able to get the protest dismissed, and that the DLA eventually awarded the contract to KGL. KGL also alleges that it competed for a "Heavy Lift 7" contract from the USASC and that the Wilson Letters affected the award of this contract because the USASC would not give the contract to KGL unless KGL addressed the Wilson Letters and proved that is was a responsible contractor. KGL again contends that it sustained losses and costs associated with addressing the USASC's concerns, but that it was able to provide the USASC with a satisfactory explanation and that it received the "Heavy Lift 7" contract.

On March 21, 2012, KGL filed suit against Agility and John Doe alleging liability for defamation, tortious interference with contractual and other business relationships, *respondeat superior,* conspiracy, aiding and abetting, and negligent supervision. KGL further alleged, and PWC admitted, that employees of PWC authored

---

* Retired Senior Judge assigned to the Superior Court.

the Wilson Letters and were acting within the scope of their employment. KGL filed an amended complaint on June 14, 2012. On August 14, 2012 and September 4, 2012, Agility filed preliminary objections that the trial court overruled on November 15, 2012 and October 19, 2012, respectively.

On September 14, 2012, KGL served discovery requests on each known defendant, including interrogatories, requests for production of documents, and requests for admissions, each with the primary purpose of identifying "Scott Wilson." Agility objected to these discovery requests based on its First Amendment right to speak anonymously and on *Pilchesky v. Gatelli*, 12 A.3d 430 (Pa.Super.2011), which Agility argued requires KGL to satisfy four requirements before it could obtain discovery identifying an anonymous or pseudonymous speaker. On December 4, 2012, KGL moved to strike Agility's objections to discovery requests and to compel discovery responses. On February 20, 2012, the trial court heard argument on this motion. Finally, on May 21, 2013, the trial court granted KGL's motion to strike Agility's objections to discovery requests and to compel discovery responses insofar as the objections relate to *Pilchesky*. In a brief memorandum provided with its order, the trial court gave the following rationale for its decision:

> Today we deal with the issue of whether or not the objections of the defendants to plaintiffs' discovery requests ought to be sustained under the principles announced in *Pilchesky v. Gatelli*, 12 A.3d 430 (Pa.Super.2011). This case contains a framework for the First Amendment protection of anonymous speech. As noted in *Lefkoe v. Jos. A. Bank Clothiers, Inc.*, 577 F.3d 240 [ (4th Cir.2009) ], our courts have 'typically protected anonymity under the First Amendment when claimed in connection with liter-

> ary, religious, or political speech.' *Id.* at 578 [248]. We are satisfied that the speech at issue in this case is commercial speech as opposed to 'literary, religious, or political.' This is a close case, however, in light of the fact that the communication addresses itself to the award of a United States government contract.

Memorandum and Order, 5/21/13, at 1–2. Therefore, the trial court granted KGL's motion because it found that *Pilchesky* did not apply to the Wilson Letters. *Id.* The trial court ruled that the Wilson Letters were commercial speech, as opposed to "literary, religious, or political" speech, and that the First Amendment affords less protection to commercial speech. *Id.*

Agility then filed this appeal. Agility presents the following issue for our review:

> 1. Whether Appellees (Plaintiffs below) were required to satisfy the First Amendment test set forth in *Pilchesky v. Gatelli*, 12 A.3d 430 (Pa.Super.Ct.2011), before obtaining an order directing Appellants (Defendants below) to respond to discovery aimed at identifying a pseudonymous speaker and anyone who assisted him, who are collectively named as a "John Doe" defendant in this action?

Brief of Agility DGS Holding, Inc., Agility Defense Government Services, Inc., and Agility International [hereinafter "Agility Brief I"] at 4.

In general, appellate courts apply an abuse of discretion standard when reviewing an order relating to discovery. *McNeil v. Jordan*, 586 Pa. 413, 426–27, 894 A.2d 1260, 1268 (2006) (citations omitted). However, this case presents a pure question of law. This Court has long held that "questions of law are accorded full appellate review, and our consideration is plenary." *Id.* (citations omitted). Therefore,

the appropriate standard of review is *de novo*. *Id.*

■ Before addressing the question presented, we must determine whether the trial court's order is appealable. This issue of appealability is of primary importance because it affects this Court's jurisdiction over the case. *See Pilchesky*, 12 A.3d at 435 (citing *In re Miscin*, 885 A.2d 558, 561 (Pa.Super.2005)). Under the Pennsylvania Rules of Appellate Procedure, "[a]n appeal may be taken from (1) a final order ... (2) an interlocutory order by right or permission ... or (3) a collateral order[.]" *Id.* at 435 n. 6 (citations omitted). Rule 313(b), relating to collateral orders, provides that,

> A collateral order is an order separable from and collateral to the main cause of action where the right involved is too important to be denied review and the question presented is such that if review is postponed until final judgment in the case, the claim will be irreparably lost.

Pa.R.A.P. 313(b). Pennsylvania courts have previously held that a trial court order compelling the disclosure of the identity of a John Doe defendant in a defamation action "raised a question entitled to collateral review." *Pilchesky*, 12 A.3d at 436 (citing *Melvin v. Doe*, 575 Pa. 264, 269–70, 836 A.2d 42, 44–45 (2003)).

We find that Agility's claim is entitled to collateral review. In this case, the determination of whether Agility must reveal the identity of "Scott Wilson" is separable from the defamation claim and other causes of action. Whether or not Agility must reveal the identity of "Scott Wilson" is solely a legal question, requiring no consideration of whether the Wilson Let-

ters were in fact defamatory. *See Melvin*, 575 Pa. at 269–70, 836 A.2d at 44–45; *Pilchesky*, 12 A.3d at 436. Additionally, the right involved is too important to deny review. Courts have long upheld, supported, and emphasized the importance of the First Amendment right to speak anonymously and pseudonymously. *See Melvin*, 575 Pa. at 269–70, 836 A.2d at 44–45; *Pilchesky*, 12 A.3d at 436. Finally, the claim presented in this case would be irreparably lost if we postponed review of the claim until final judgment in the case. If we waited until final judgment to review whether the trial court properly compelled Agility to disclose the identity of "Scott Wilson," the parties in this case would already know the identity of "Scott Wilson" and any chance of protecting his or her identity would be lost. *See Melvin*, 575 Pa. at 269–70, 836 A.2d at 44–45; *Pilchesky*, 12 A.3d at 436. Thus, this claim is entitled to collateral review and is properly before this Court.

■ KGL also argues that Agility lacks standing to assert the First Amendment rights of "Scott Wilson." We find that KGL has waived this issue on appeal. This Court has long held that the issue of standing may be waived by a party "if not objected to at the earliest possible opportunity." *In re Estate of Brown*, 30 A.3d 1200, 1204 (Pa.Super.2011) (citation and quotation omitted); *see also* Pa.R.A.P. 302(a) (stating that "[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal"). KGL admits in its own brief that it did not raise the issue of standing before the trial court. KGL's Brief at 21 n. 9. Therefore, KGL has waived any standing issue on appeal.[1]

---

1. Even if KGL had properly raised the standing issue at the trial court, Agility would still have standing to raise "Scott Wilson's" First Amendment rights. Our *Pilchesky* decision noted:

> In the specific context of the First Amendment, the [United States] Supreme Court 'has enunciated other concerns that justify a lessening of prudential limitations on standing.' It has also relaxed these 'rules

We now turn our attention to the merits of this case. Agility argues that the trial court erred when it ordered discovery compelling the disclosure of "Scott Wilson's" identity because the First Amendment preserves the right to speak anonymously and pseudonymously. Brief for PWC, Agility DGS Logistics Services Company, K.S.C.C., and PWC Transport Company W.L.L. [hereinafter "Agility Brief II"] at 15. Agility contends that the Wilson Letters are entitled to heightened First Amendment protection because they discuss a public figure in a matter of public concern. *Id.* at 20–37. Agility further argues that the trial court improperly categorized the Wilson Letters as commercial speech. *Id.* at 41–48. Finally, Agility contends that, even if the Wilson Letters do represent commercial speech, the trial court wrongly ruled that *Pilchesky* does not apply to commercial speech, but rather only applies to literary, religious, or political speech. *Id.* at 37–41. It is Agility's contention that *Pilchesky* applies to all speech protected under the First Amendment and to any discovery request seeking to identify an anonymous or pseudonymous speaker in a defamation action. *Id.*

The First Amendment to the United States Constitution states that Congress may not make any law limiting the freedom of speech. U.S. Const. amend. I. Under the First Amendment, different types of speech receive different levels of protection. The United States Supreme Court has held, for example, political speech receives extensive constitutional protection; commercial speech receives an intermediate level of protection; and obscene speech receives no First Amendment protection. *See Citizens United v. Fed. Election Comm'n,* 558 U.S. 310, 370, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010) (holding that political speech receives the highest First Amendment protection); *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York,* 447 U.S. 557, 562–66, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980) (applying an intermediate scrutiny standard to commercial speech); *Miller v. California,* 413 U.S. 15, 36, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973) (holding that obscenity receives no First Amendment protection). Because neither party argues that the Wilson Letters are obscene speech, we will only discuss political and commercial speech.

The United States Supreme Court has defined core political speech as involving the " 'interchange of ideas for the bringing about of political and social changes desired by the people.' " *Meyer v. Grant,* 486 U.S. 414, 421, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988) (quoting *Roth v. U.S.,* 354 U.S. 476, 484, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957)); *see also New York Times Co. v. Sullivan,* 376 U.S. 254, 269, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Political speech includes "discussions of candidates, structures and forms of government, the manner in which government is operated or should be operated, and all such matters relating to political processes." *Mills v. Alabama,* 384 U.S. 214, 218–19, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966). The Supreme Court has also described political speech as "interactive communication con-

---

of standing without regard to the relationship between the litigant and those whose rights he seeks to assert precisely because application of those rules would have an intolerable, inhibitory effect on freedom of speech.'

*Pilchesky,* 12 A.3d at 437 n. 9 (citations omitted). Based on *Pilchesky's* analysis, Agility

would be able to assert "Scott Wilson's" First Amendment rights because if "Scott Wilson" had to do so himself, he or she would lose his or her anonymity, which would create an inhibitory effect on freedom of speech. *See id.*

cerning political change." *Meyer,* 486 U.S. at 422, 108 S.Ct. 1886.

The Court's protection of political speech is pervasive. *See Nixon v. Shrink Missouri Gov't PAC,* 528 U.S. 377, 410–11, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000). There are many examples of the Court upholding several different forms political speech, including political speech made by corporations, public policy discussions, derogatory comments about the government, speech in the context of political campaigns, and even defamatory speech about public officials or matters of public concern. *See Citizens United,* 558 U.S. at 365, 130 S.Ct. 876 (holding that "the Government may not suppress political speech on the basis of the speaker's corporate identity"); *Consol. Edison Co. of New York, Inc. v. Pub. Serv. Comm'n of New York,* 447 U.S. 530, 544, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980) (striking down a regulation prohibiting utility companies from placing inserts into customer bills discussing public policy); *Cohen v. California,* 403 U.S. 15, 26, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) (reversing a conviction for speaking a four-letter expletive critical of the draft); *Monitor Patriot Co. v. Roy,* 401 U.S. 265, 272, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971) (protecting speech in the context of campaigns for political office); *New York Times,* 376 U.S. at 283, 84 S.Ct. 710 (protecting defamatory falsehoods made against public officials unless proven statement was made with actual malice).

The Supreme Court has afforded great protection to political speech because "a self-governing people depends upon the free exchange of political information." *Nixon,* 528 U.S. at 411, 120 S.Ct. 897. In fact, the Supreme Court has repeatedly held that "[l]aws that burden political speech are 'subject to strict scrutiny,' which requires the Government to prove that the restriction 'furthers a compelling

interest and is narrowly tailored to achieve that interest.'" *Citizens United,* 558 U.S. at 340, 130 S.Ct. 876 (quoting *Fed. Election Comm'n v. Wisconsin Right To Life, Inc.,* 551 U.S. 449, 464, 127 S.Ct. 2652, 168 L.Ed.2d 329 (2007)); *see also Arizona Free Enter. Club's Freedom Club PAC v. Bennett,* —— U.S. ——, 131 S.Ct. 2806, 2817, 180 L.Ed.2d 664 (2011); *Nixon,* 528 U.S. at 410–11, 120 S.Ct. 897 (stating, "[p]olitical speech is the primary object of First Amendment protection"); *Mills,* 384 U.S. at 218, 86 S.Ct. 1434 (maintaining that "there is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs"). Therefore, political speech receives extensive First Amendment protection.

■ Another type of protected speech is commercial speech. Commercial speech is "speech that does no more than propose a commercial transaction." *U.S. v. United Foods, Inc.,* 533 U.S. 405, 409, 121 S.Ct. 2334, 150 L.Ed.2d 438 (2001) (citing *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 762, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976)); *see also Edenfield v. Fane,* 507 U.S. 761, 767, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993); *Posadas de Puerto Rico Assocs. v. Tourism Co. of Puerto Rico,* 478 U.S. 328, 340, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986). According to the United States Supreme Court, commercial speech occurs where the speaker

does not wish to editorialize on any subject, cultural, philosophical, or political. He does not wish to report any particularly newsworthy fact, or to make generalized observations even about commercial matters. The "idea" he wishes to communicate is simply this: "I will sell you the X prescription drug at the Y price."

*Virginia State Bd. of Pharmacy*, 425 U.S. at 761, 96 S.Ct. 1817. The Supreme Court has established the following three-factor test that further develops the definition of commercial speech: (1) the speech is an advertisement; (2) the speech references a specific product; or (3) the speaker has an economic motivation for making the communication. *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 66–67, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983). The Court explained that the existence of any of these factors alone could not compel the conclusion that the speech was commercial. *See id.*

The most common examples of commercial speech in the Supreme Court's jurisprudence are those communications that advertise or promote a specific product. *See, e.g., City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 416, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993) (analyzing real estate advertisements under the scope of commercial speech); *Bolger*, 463 U.S. at 68, 103 S.Ct. 2875 (holding that advertisements for contraceptives were commercial speech); *Virginia State Bd. of Pharmacy*, 425 U.S. at 761, 96 S.Ct. 1817 (finding advertising prices for prescription drugs to be commercial speech).

█ The Supreme Court has "used standards for determining the validity of speech regulations which accord less protection to commercial speech than to other expression." *United Foods*, 533 U.S. at 409, 121 S.Ct. 2334; *see also Sorrell v. IMS Health Inc.*, — U.S. ——, 131 S.Ct. 2653, 2673–74, 180 L.Ed.2d 544 (2011) (stating that "the First Amendment imposes tight constraints upon government efforts to restrict, *e.g.*, 'core' political speech, while imposing looser constraints when the government seeks to restrict, *e.g.*, commercial speech …"); *Virginia State Bd. of Pharmacy*, 425 U.S. at 762, 96 S.Ct. 1817 (holding that commercial speech is not dis-

qualified from protection under the First Amendment). Specifically, the Supreme Court developed the following four-part test of intermediate scrutiny to determine whether commercial speech falls within in the protection of the First Amendment:

> For commercial speech to come within [the First Amendment], it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

*Cent. Hudson*, 447 U.S. at 566, 100 S.Ct. 2343. Therefore, commercial speech is entitled to less protection under the First Amendment than political speech.

The Supreme Court has also repeatedly held that the First Amendment protects the right to speak anonymously. *See, e.g., Watchtower Bible and Tract Society of New York, Inc. v. Village of Stratton et al.*, 536 U.S. 150, 166–69, 122 S.Ct. 2080, 153 L.Ed.2d 205 (2002) (holding that an ordinance making it illegal to engage in door-to-door advocacy without registering and receiving a permit violated the First Amendment as applied to anonymous political speech); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995) (holding that prohibiting anonymous campaign literature violates the First Amendment); *Talley v. California*, 362 U.S. 60, 65, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960) (finding that "States may not compel members of groups engaged in the dissemination of ideas to be publicly identified"). Our Court has also upheld the right to engage in political speech anonymously or pseudonymously. *Pilchesky*, 12 A.3d at 442–45.

Nonetheless, the right to speak anonymously is not absolute, with both the United States Supreme Court and the Supreme Court of Pennsylvania specifically identifying defamatory speech as an "evil" States may prohibit. *Melvin*, 575 Pa. at 276, 836 A.2d at 49 (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 341, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)). *Pilchesky* specifically addressed the issue of under what circumstances a trial court can compel the disclosure of the identity of individuals speaking anonymously or pseudonymously in a defamation case. *Pilchesky*, 12 A.3d at 442.

In *Pilchesky*, John Does made allegedly defamatory statements about the President of Scranton City Council by posting messages on a website under a unique user name or pseudonym. *Id.* at 432–33. The plaintiff petitioned the trial court to compel the disclosure of the identity of the John Doe defendants and that court granted the petition. *Id.* at 433–34.

On appeal, this Court held that the trial court must address the following four factors before ordering the disclosure of the identity of an anonymous or pseudonymous speaker: first, "[t]he reviewing court must ensure that the John Doe defendant receives proper notification of a petition to disclose his identity and a reasonable opportunity to contest the petition"; second, the party seeking disclosure "must present sufficient evidence to establish a prima facie case for all elements of a defamation claim, *within the plaintiff's control*, such as would survive a motion for summary judgment"; third, "[a] petitioner must submit an affidavit asserting that the requested information is sought in good faith, is unavailable by other means, is directly related to the claim and is fundamentally necessary to secure relief"; and fourth, "[t]he court must expressly balance the defendant's First Amendment rights against the strength of the plaintiff's *prima facie* case." *Id.* at 442–45. This Court stated that the four requirements "are necessary to ensure the proper balance between a speaker's right to remain anonymous and a defamation plaintiff's right to seek redress." *Id.* at 442.

Turning our attention to the facts of this case, we find that the Wilson Letters constitute anonymous or pseudonymous political speech, thus receiving extensive constitutional protection under the First Amendment. We conclude that the Wilson Letters represent political speech because the award of substantial government contracts to contractors who are claimed to illegally engage in business with a prohibited foreign government directly implicates "the manner in which government is operated or should be operated." *Meyer*, 486 U.S. at 422, 108 S.Ct. 1886; *Mills*, 384 U.S. at 218–19, 86 S.Ct. 1434. We also have no problem concluding that the Wilson Letters discuss affairs of government which are at the heart of First Amendment protections. *Mills*, 384 U.S. at 218, 86 S.Ct. 1434. "Scott Wilson" wrote the Wilson Letters to the DLA and the USASC to inform them that he believed that KGL maintained business relationships with Iranian entities in violation of CISADA. KGL is a government contractor performing multimillion-dollar contracts for the United States military. The DLA and the USASC are two government agencies responsible for the operation for the United States military. Additionally, KGL's alleged misconduct involved its possible connection to Iran businesses, misconduct that is a national and newsworthy issue. Thus, at their core, the Wilson Letters represent political speech involving the operation of the government and the questionable expenditure of public funds. The Wilson Letters directly implicate the appropriateness of the relation-

ship between the United States Government and some of its contractors and those contractors' relationships with a foreign government in conflict with the United States.

■ Furthermore, we note that the Wilson Letters cannot be categorized as commercial speech. The Wilson Letters do not "propose a commercial transaction," *United Foods, Inc.*, 533 U.S. at 409, 121 S.Ct. 2334 or propose the sale of a specific product at a specific price, *see Virginia State Bd. of Pharmacy*, 425 U.S. at 761, 96 S.Ct. 1817. Moreover, the Wilson Letters: (1) are not an advertisement; (2) they do not reference any specific product; and (3) we are unable to determine whether or not the author had an economic motivation for making the communication. *See Bolger*, 463 U.S. at 66–67, 103 S.Ct. 2875. Although PWC admitted that its employee authored the Wilson Letters, there is no evidence indicating whether he did so as a concerned citizen or whether he did so to advance the interests of Agility. Likewise, even if we knew that the author wrote the Wilson Letters with an economic motivation, that knowledge alone is insufficient to compel the classification of the Wilson Letters as commercial speech. *See id.* Therefore, given the political nature of the Wilson Letters, they are entitled to the highest level of protection and not the intermediate level of protection that commercial speech receives under the First Amendment.[2]

Accordingly, we find that the Wilson Letters are anonymous political speech under the First Amendment subject to *Pilchesky's* four-part test for disclosure of anonymous or pseudonymous speakers.

Therefore, we vacate the order of the trial court compelling discovery of the identity of "Scott Wilson" and remand this case to the trial court for the application of the *Pilchesky* analysis.

Order vacated. Case remanded for application of *Pilchesky*. Jurisdiction relinquished.

PLATT, J. files a Dissenting Opinion.

## DISSENTING OPINION BY PLATT, J.:

I respectfully dissent. The learned Majority concludes that the two emails at issue constitute political speech. I do not agree. I would affirm the trial court's order to compel discovery.

First, there is a substantial question whether the emails are protected public speech at all. They were private communications to a contract administrator concededly written by Appellant's employee(s) within the scope of employment, under a false name, alleging that a contract winning competitor had illegal ties with Iranian entities, in violation of a statute. The emails suggest that Appellee be barred from receiving government contracts. Appellant would have been the direct beneficiary of the debarment of its competitor.

These emails do not advocate social or political change. They do not support or oppose any political candidate or office holder. They do not address official conduct of anyone acting in a public capacity. They do not support or oppose a policy position or disclose governmental misfeasance. At best, they report the statutory non-compliance of a commercial competitor. At worst, they present defamatory

---

**2.** We emphasize that commercial speech is not unprotected speech. *See Cent. Hudson,* 447 U.S. at 566, 100 S.Ct. 2343. While we do not discern in *Pilchesky* any limitations on the type of protected anonymous speech to which its test applies, because we find that the Wilson Letters are political speech, we do not need to decide whether *Pilchesky* applies to commercial speech.

forged reports for private gain. The incidental fact that the private lawsuit between these two commercial competitors involves cross allegations over the violation of a statute is too attenuated a link to elevate the emails in dispute to protected political speech. This is not the stuff of the Federalist Papers, or even the Pentagon Papers. It is more akin to Gimbels versus Macy's.

I note that if Appellee's claim that the emails (and the supporting documentation) were false is itself accurate, there is no constitutional issue. *See Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) ("Untruthful speech, commercial or otherwise, has never been protected for its own sake."); *see also Central Hudson Gas & Elec. Corp. v. Public Service Commission of New York*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980)[1] ("For commercial speech to come within [the First Amendment], it at least must concern lawful activity and not be misleading."). *Id.* at 566, 100 S.Ct. 2343.[2]

This is a commercial dispute, not a political speech case. It may not even be a commercial speech case. In any event, the trial court's discovery order was proper. Accordingly, I respectfully dissent.

---

1. *See Central Hudson, supra* for the United States Supreme Court's four part analysis to determine if commercial speech is constitutionally protected. *Id.* at 566, 100 S.Ct. 2343.

2. Moreover, under federal constitutional jurisprudence, there is a substantial question whether foreign nationals outside the jurisdiction of the United States can claim First Amendment rights. *See DKT Memorial Fund Ltd. v. Agency for Intern. Development*, 887 F.2d 275, 284, 281 U.S.App.D.C. 47, 56 (C.A.D.C.1989) (citing cases). Here, while Appellants oppose disclosure of the identity of the employee(s) posing as "Steve Wilson," they have not claimed the writers are American citizens, and the conceded reality that the emails originated in Kuwait lends probability to the opposite conclusion.