J-A03039-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| PENN ENTERTAINMENT, INC., F/K/A PENN NATIONAL GAMING, INC., AMERISTAR CASINO BLACK HAWK, LLC, SOKC, LLC, PENN SANFORD, LLC, AMERISTAR CASION COUNCIL BLUFFS, LLC, ALTON CASIN, LLC, HC AURORA, LLC, HC JOLIET, LLC, ILLINOIS GAMING INVESTORS LLC, AMERISTAR CASINO EAST CHICAGO, LLC, INDIANA GAMING COMPANY, LLC, KANSAS ENTERTAINMENT, LLC, PNK (BOSSIER CITY), L.L.C., LOUISIANA-I GAMING, PNK (BATON ROUGE) PARTNERSHIP, PNK (LAKE CHARLES), L.L.C., BOSSIER CASINO VENTURE, LLC, PLAINVILLE GAMING AND REDEVELOPMENT, LLC, HC BANGOR, LLC, GREEKTOWN CASINO, L.L.C., THE MISSOURI GAMING COMPANY, LLC, ST. LOUIS GAMING VENTURES, LLC, PNK (RIVER CITY), LLC, RIH ACQUISITIONS MS II, LLC, PNK VICKSBURG, LLC, BTN, LLC, BSLO, LLC, HWCC-TUNICA, LLC, PENN NJ OTW, LLC, ZIA PARK LLC, CACTUS PETE'S, LLC, LVGV, LLC, TROPICANA LAS VEGAS, INC., CENTRAL OHIO GAMING VENTURES, LLC, TOLEDO GAMING VENTURES, LLC, DAYTON REAL ESTATE VENTURES, LLC, YOUNGSTOWN REAL ESTATE VENTURES, LLC, MOUNTAINVIEW THOROUGHBRED RACING ASSOCIATION, LLC, CCR RACING MANAGEMENT, WASTINGTON TROTTING ASSOCIATION, LLC, MARQUEE BY PENN, LLC, SAM HOUSTON RACE PARK, LLC, AND PNGI CHARLES TOWN GAMING, LLC | : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA

No. 832 EDA 2024 |
| Appellants | : | |

|  | : |
|  | : |
|  | : |
| v. | : |
|  | : |
|  | : |
|  | : |
| ZURICH AMERICAN INSURANCE, | : |
| AIOI NISSAY DOWA INSURANCE | : |
| COMPANY LTD., CHINA RE, SWISS | : |
| RE, INTERSTATE FIRE AND | : |
| CASUALTY COMPANY, AMERICAN | : |
| INTERNATIONAL GROUP UK LTD, | : |
| AMERISTAR CASINO COUNCIL | : |
| BLUFFS, LLC, ACE AMERICAN | : |
| INSURANCE COMPANY, HALLMARK | : |
| SPECIALTY INSURANCE COMPANY, | : |
| STARR SURPLUS LINES INSURANCE | : |
| COMPANY, KOREAN REINSURANCE | : |
| COMPANY, BERKLEY RE, SINOSAFE | : |
| GENERAL INSURANCE COMPANY, | : |
| LTD, COLONY INSURANCE COMPANY, | : |
| AXIS SURPLUS INSURANCE | : |
| COMPANY, EVANSTON INSURANCE | : |
| COMPANY, GREAT AMERICAN | : |
| INSURANCE COMPANY, QBE | : |
| SPECIALTY INSURANCE COMPANY, | : |
| NEON WORLDWIDE PROPERTY | : |
| CONSORTIUM 9761, CERTAIN | : |
| UNDERWRITERS AT LLOYD'S | : |
| LONDON-1886 QBE, CERTAIN | : |
| UNDERWRITERS AT LLOYD'S | : |
| LONDON- 1414 ASC, CERTAIN | : |
| UNDERWRITERS AT LLOYD'S | : |
| LONDON- AXIS SPEC EURO SE LIR, | : |
| CERTAIN UNDERWRITERS AT | : |
| LLOYD'S LONDON- 2468 NEO, | : |
| CERTAIN UNDERWRITERS AT | : |
| LLOYD'S LONDON- 0033 HIS, | : |
| CERTAIN UNDERWRITERS AT | : |
| LLOYD'S LONDON- 1183 TAL, | : |
| CERTAIN UNDERWRITERS AT | : |
| LLOYD'S LONDON- 1200 AMA, HCC | : |
| INTERNATIONAL INSURANCE | : |
| COMPANY PLC, CERTAIN | : |
| UNDERWRITERS AT LLOYD'S | : |

- 2 -

| LONDON- 4444 CNP, CERTAIN | : |
| UNDERWRITERS AT LLOYD'S | : |
| LONDON- 1458 RNR, CERTAIN | : |
| UNDERWRITERS AT LLOYD'S | : |
| LONDON- 0609 AUW | : |

Appeal from the Order Entered February 22, 2024
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  200801187

BEFORE:  STABILE, J., McLAUGHLIN, J., and LANE, J.

MEMORANDUM BY LANE, J.:                    **FILED MAY 7, 2025**

Penn Entertainment, Inc., and its various operating subsidiaries, as identified in the caption (collectively "Penn"), appeals from the orders: granting the motions for summary judgment filed by Penn's various insurers, as identified in the caption (collectively "Insurers"); denying Penn's motions for partial summary judgment against Insurers; and granting Zurich American Insurance Company's ("Zurich") motion to deem admitted certain of its requests for admission directed to Penn.  We affirm.

In this insurance coverage dispute, Penn challenges the denial of its claims for insurance coverage benefits for economic losses Penn sustained due to business closures caused by the COVID-19 pandemic.  Penn is a Pennsylvania-based gaming company that, through its various subsidiaries, owns, operates, or has ownership interests in more than forty casinos, racetracks, and gaming facilities.  Penn purchased a group of commercial property insurance policies for these businesses from the Insurers which were in effect from December 31, 2019, to December 7, 2020.  Although the Insurers generally sold separate policies to Penn, every policy issued to Penn

incorporated the same eighty-nine-page core policy form, subject to endorsements added by each Insurer. Importantly, the common core policy provided policy declarations that included an insuring agreement which specified:

> Subject to the terms, conditions, exclusions and limitations contained here or endorsed herein and in consideration of the premium charged, this "policy" covers all risks of **direct physical loss or damage to insured property** at insured location(s), provided such physical loss or damage occurs during the policy period.

Policy, Section 1(A), at 4 of 89 (emphasis added).

Penn sought coverage under the policies for economic losses it suffered after its various facilities were closed due to orders issued by the Gaming Control Board ("GCB") and civil authorities at the inception of the global outbreak of COVID-19 in March 2020. Upon receipt of Penn's insurance claims, the Insurers denied coverage on the basis that, pursuant to the insuring agreement and all relevant endorsements, the polices required "direct physical loss or damage" to the insured property. The Insurers took the position that, because no "direct physical loss or damage" had occurred to any of the insured premises, coverage was not triggered under the policies.

Penn then initiated the instant declaratory judgment action seeking a judicial determination that its business income losses were covered by the subject commercial property insurance policies, and the Insurers were obligated to provide policy benefits for such losses. Penn argued that several types of coverage provided by the policies, including coverage for time

element losses and orders by the GCB and civil authorities, applied to its claim for business losses stemming from the COVD-19 closures of its various facilities. Two of the Insurers, Interstate Fire & Casualty Company ("IFCC") and ACE American Insurance Company ("ACE"), filed counterclaims against Penn for reformation of their polices due to a mutual mistake in endorsements included in their policies.[1]

The matter then proceeded through extensive discovery. Zurich served requests for admission upon Penn. Based on Penn's responses, Zurich filed a motion to deem as admitted certain of its requests for admission directed to Penn. On September 7, 2023, and October 11, 2023, the trial court entered orders granting Zurich's motions. The Insurers then filed a joint motion for summary judgment on Penn's claims against them. Penn filed motions for partial summary judgment regarding its right to coverage under the Time-Element loss provisions, the "Interruption by Gaming or Racing Control Board" endorsement ("the GCB endorsement"), and the non-application of certain policy exclusions. The trial court entered orders granting the motions for summary judgment filed by IFCC and Ace on their counterclaims for reformation and denying Penn's motions for partial summary judgment

---

[1] IFCC and Ace sought reformation of the policies they issued to Penn based on a transcription error in which the sublimits for communicable disease and crisis management coverages, while negotiated to be $5,000,000 and confirmed as such in the relevant insurance quotes and binders, appeared as "$" in the policies.

against Insurers. On February 22, 2024,[2] the trial court entered an order granting summary judgment for all Insurers on Penn's claims against them on the basis that no coverage was triggered under the polices because there was no direct physical loss or damage to Penn's covered properties.[3] Penn filed a timely notice of appeal, and both it and the trial court complied with Pa.R.A.P. 1925. This Court thereafter issued a briefing schedule to which the parties adhered.

However, after the parties had completed their briefing in this matter, our Supreme Court issued its opinion in **Ungarean v. CNA**, 323 A.3d 593 (Pa. 2024), wherein it addressed claims similar to those raised herein by Penn.[4] In **Ungarean**, a dentist, individually and on behalf of a class of similarly situated individuals, claimed that he was entitled to coverage under his commercial property insurance policy for financial losses sustained following

_____

[2] The trial court had entered earlier orders which inadvertently provided rulings on all but one motion for summary judgment by the Insurers. Accordingly, the trial court vacated a prior order entered on January 31, 2024, and entered a clarifying order on February 22, 2024, which granted all motions for summary judgment filed by Insurers, and which had the effect of disposing of all claims against all parties.

[3] The trial court further determined that, because no coverage was triggered under the polices, it did not need to address Penn's motion for partial summary judgment regarding the non-application of policy exclusions and denied that motion as moot.

[4] We note that Penn appeared in the **Ungarean** litigation, represented by the same counsel, and filed _amicus curiae_ briefs in favor of a finding of insurance coverage for COVID-19 related financial losses caused by business closures.

the COVID-19 pandemic and Pennsylvania's non-essential business shutdown in March 2020. The High court ruled that, pursuant to the plain and unambiguous language of his commercial property insurance policy, he was not entitled to coverage because his covered business properties did not sustain any direct physical loss or damage. Furthermore, the Court ruled that the **sole** reason for the insured's financial losses during the policy period was the government-ordered shutdown due to COVID-19, which prevented him from operating his insured properties at their full potential. The High Court stated:

> In short, we conclude that the language of the CNA policy is not ambiguous because it is subject to only one reasonable interpretation. That is, for coverage to apply under the CNA policy, there must be a physical alteration to the subject property as a result of a direct physical loss or damage necessitating repairs, rebuilding, or entirely replacing the property. As applied to the present case, we fail to find any facts in the record suggesting that the covered properties required these necessary actions in order to trigger coverage under the CNA policy. . . . Ungarean did not lose access to the covered properties during the government-ordered COVID-19 shutdown whatsoever; Ungarean could enter the covered properties at will and Ungarean's business remained open for emergency dental procedures. The only loss Ungarean sustained, rather, was **pure** economic loss because the government-ordered COVID-19 shutdown prevented Ungarean from operating his covered properties at their full potential. That partial closure, however, had nothing to do with the physical attributes of the covered properties, as required by the CNA policy for insurance coverage.

**Id**. at 608-09 (emphasis in original, unnecessary capitalization omitted). The High Court additionally determined that "[b]ecause the government-ordered COVID-19 shutdown cannot constitute 'direct physical loss of or damage to'

- 7 -

*any* property," the civil authority endorsement of the CNA policy simply did not apply. *Id*. at 610 (emphasis in original).

On the same day that it issued its decision in ***Ungarean***, the High Court affirmed this Court's decision in ***Macmiles, LLC v. Erie Ins. Exch.***, 286 A.3d 331 (Pa. Super. 2022) (*en banc*), *affirmed*, 323 A.3d 610 (Pa. 2024). Therein, MacMiles, a tavern owner, sought coverage under his commercial property insurance policy for business losses he sustained as a result of the COVID-19 shutdown. The insurer denied coverage because MacMiles' covered property did not suffer any physical loss or damage. On appeal, this Court ruled that the trial court erred in granting partial summary judgment in favor of MacMiles and in denying Erie's motion for judgment on the pleadings. In so doing, this Court noted that "[n]early all courts addressing this issue have held that economic loss unaccompanied by a physical alteration to the property does not trigger coverage under a commercial property insurance policy." *Id*. at 335. Instead, this Court ruled, "policy language covering "'direct physical loss or damage' unambiguously requires that the 'claimed loss or damage must be physical in nature.'" *Id*. at 337-38. This Court additionally observed that "the prohibition on in-person dining had nothing to do with any condition, visible or invisible, at the . . . tavern. Rather, the prohibition was meant to eliminate the possibility of infected patrons spreading an airborne illness to uninfected patrons." *Id*. at 338. This Court also addressed whether the presence of the COVID-19 virus constituted "physical damage," in the context of coverage for

loss of business income where a civil authority prohibits access to the insured premises. *Id*. at 339-40. This Court concluded, "where the alleged property damage is invisible (as is the possible presence of Covid-19 on surfaces), it does not qualify as physical damage for purposes of a commercial property insurance policy." *Id*. at 340.

Based on the High Court's decision in *Ungarean*, and its affirmance of *MacMiles*, this Court continued the instant case to the next argument panel to permit the parties to submit supplemental briefs regarding the effect of these decisions on the issues in this case.[5] The parties did so. A few days before the rescheduled oral arguments were to take place in this matter, this Court issued its decision in *Scranton Club v. Tuscarora Wayne Mut. Grp., Inc.*, 2025 Pa. Super. LEXIS 180 (Pa. Super. 2025) (unpublished memorandum), following remand from our Supreme Court for reconsideration of the case in light of *Ungarean*.[6] The Insurers sent a letter brief to this Court to advise it of the recent *Scranton Club* decision. In *Scranton Club*, this

---

[5] Notably, Penn's appellate brief and reply brief relied heavily on this Court's decision in *Ungarean*, and this Court's initial decision in *Scranton Club*, both which were vacated by the Supreme Court. Thus, most of the argument provided by Penn in its initial brief and reply brief was rendered moot by the high Court's decision in *Ungarean*, and its affirmance of *MacMiles*.

[6] This Court had issued a prior decision in the case at *Scranton Club v. Tuscarora Wayne Mut. Grp., Inc.*, 305 A.3d 982 (Pa. Super. 2023) (unpublished memorandum). The High Court granted allowance of appeal, vacated that decision, and remanded the matter back to this Court to issue a new ruling in light of its *Ungarean* decision. *See Scranton Club v. Tuscarora Wayne Mut. Grp., Inc.*, 2024 Pa. LEXIS 1919 (Pa. 2024).

Court addressed similar claims for economic losses as a result of COVID-19 related business shutdowns. This Court affirmed the trial court's order sustaining the preliminary objections filed by insurers and dismissing all claims against insurers with prejudice. In so doing, this Court reasoned, "[t]here was no "physical damage" and therefore nothing that required restoration of [the insured's] property as a result of the COVID shutdown. As such, there was no coverage under the policy." *Id*. (unpublished memorandum at *5). This matter then proceeded to oral argument before the merits panel, at which the parties discussed the effect of the *Ungarean*, *MacMiles*, and *Scranton Club* cases. The appeal is now ripe for our disposition.

Penn raises the following issues for our review:

1. Did the trial court err in granting summary judgment for the Insurers, denying partial summary judgment for Penn, and more specifically, in concluding that:

   a. Penn's COVID-19 related losses did not result from "physical loss or damage" under the . . . policies?

   b. orders of state GCBs or equivalents resulting from the COVID-19 pandemic did not trigger Penn's bespoke GCB coverage under the Insurers' . . . policies . . ..?

   c. orders of civil authorities resulting from the COVID-19 pandemic did not trigger coverage under the . . . policies?

   d. the contamination exclusion, interruption of business/loss of use exclusion, and law or ordinance exclusion could apply to Penn's time-element losses and denying Penn's exclusions motion as moot; and

   e. IFCC's and ACE's reformation motions should be granted because of an alleged mutual mistake in the . . . policies they delivered to Penn?

2. Did the trial court err . . . by granting Zurich's motion to deem admitted [requests for admission] 36-38, 52-53, 57-60, and 69-82 and its . . . order . . . denying Penn's motion for partial reconsideration of the court's . . . order deeming [requests for admission] 36-38 admitted?

Penn's Brief at 8-9 (unnecessary capitalization omitted, issues reordered for ease of disposition).

Our standard of review of an order granting or denying summary judgment is well-settled:

> In evaluating the trial court's decision to enter summary judgment, we focus on the legal standard articulated in the summary judgment rule. [*See*] Pa.R.C.P. 1035.2. The rule states that where there is no genuine issue of material fact and the moving party is entitled to relief as a matter of law, summary judgment may be entered. Where the non-moving party bears the burden of proof on an issue, he may not merely rely on his pleadings or answers in order to survive summary judgment. Failure of a nonmoving party to adduce sufficient evidence on an issue essential to his case and on which it bears the burden of proof establishes the entitlement of the moving party to judgment as a matter of law. Lastly, we will view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party.

*State Farm Mut. Auto. Ins. Co. v. Dooner*, 189 A.3d 479, 482 (Pa. Super. 2018); *see also Washington v. Baxter*, 719 A.2d 733, 737 (Pa. 1998) (holding that, in order to withstand a motion for summary judgment, a non-moving party must adduce sufficient evidence on an issue essential to his case and on which he bears the burden of proof such that a jury could return a verdict in his favor).

An insured may invoke the Declaratory Judgments Act, 42 Pa.C.S.A. § 7531, *et seq.*, to determine whether an insurance contract covers an asserted claim. **See Genaeya Corp. v. Harco Nat'l Ins. Co.**, 991 A.2d 342, 346 (Pa. Super. 2010). "In reviewing a declaratory judgment, we are limited to determining whether the trial court committed a clear abuse of discretion or committed an error of law." **Vanderhoff v. Harleysville Ins. Co.**, 997 A.2d 328, 332 (Pa. 2010).

Further, because an insurance policy is, at its base, nothing more than a contract between an insurer and an insured, we apply general principles of contract interpretation. **See Ungarean**, 323 A.3d at 604. As our Supreme Court has explained:

> The purpose of that task is to ascertain the intent of the parties as manifested by the terms used in the written insurance policy. The language of the policy must be construed in its plain and ordinary sense, and the policy must be read in its entirety. Where a policy's provisions are unambiguous, a court is required to give effect to that language. Where a provision of a policy is ambiguous the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement. Ambiguity exists in a contract where its language is reasonably susceptible of different constructions and capable of being understood in more than one sense. This Court will not distort the meaning of the language or resort to a strained contrivance, however, in order to find an ambiguity.

**Id**. (citations, quotations, and brackets omitted)

In its first issue, Penn contends that the trial court erred by determining that coverage under the policies was not triggered because it did not sustain any "direct physical loss or damage." Penn points out that the polices do not

define "physical loss or damage." Penn claims that, unlike the policyholders in **Ungarean** and **MacMiles**, who did not allege that the COVID-19 virus was on the covered properties or caused any physical damage thereto at any time during the government-ordered shutdown, Penn put forward substantial, credible evidence that its properties suffered physical damage as a result of the pandemic because virus particles became stuck to surfaces through a physicochemical interaction of adsorption. Penn points to the thousands of pages it presented to the trial court from its various experts that showed "the virus is physically measurable; it has a physical impact on, and physically damages, the surfaces and the air where it is present." Penn's Supplemental Brief at 6.

The trial court, without the benefit of **Ungarean**, **MacMiles**, or **Scranton Club**, considered Penn's first issue and determined that it lacked merit. The court reasoned:

> [T]he polic[ies'] declarations plainly state the policy only covers "direct physical loss or damage" to the insured property and each type of coverage reiterates this requirement.
>
> * * * *
>
> [I]n case after case, courts have held that claims for COVID-19 related business losses which require "direct physical loss or damage" are not covered given that in these cases the premises involved have not been structurally altered or damaged and there was no issue with the physical premises that impeded or prevented business operations.
>
> In other words, the inability to use the property must have some direct nexus to the physical condition of the premises. Thus, even if Penn's properties were contaminated with COVID-19, the

virus did not damage or physically alter the premises and its claim therefore does not give rise to coverage. While Penn makes an array of arguments as to why coverage applies, many are based on a reading of "physical loss" that makes it synonymous with "loss of use," an interpretation that has already been rejected in hundreds of cases. The rest of Penn's arguments rely on a conception of physical "damage" far removed from the everyday understanding of that word as its employed in the polic[ies]. The court here follows the near unanimous opinion of state and federal courts across the country in reading "direct physical loss or damage" as unambiguously requiring physical/structural damage to the property in order to trigger coverage under the polic[ies]. As a result, the court grant[ed] [Insurers'] motion for summary judgment.

Trial Court Opinion, 4/8/24, at 4-5 (footnotes and unnecessary capitalization omitted).

Based on our review, we conclude that the language included in each of the policies, which requires "direct physical loss or damage," is not ambiguous because it is subject to only one reasonable interpretation. **See Ungarean**, 323 A.3d at 608. As our Supreme Court explained:

> . . . [T]he only reasonable interpretation of the operative phrase "direct physical loss of or damage to property" in the CNA Policy becomes clear: There must be either (1) a physical disappearance, partial or complete deterioration, or absence of a physical capability or function of the property (loss), or (2) a **physical** harm or injury to the property (damage). In other words, a **physical** alteration to the subject property is a threshold requirement for coverage to apply under the CNA Policy.
>
> * * * *
>
> . . . That is, for coverage to apply under the CNA Policy, there must be a physical alteration to the subject property as a result of a direct physical loss or damage necessitating repairs, rebuilding, or entirely replacing the property.

**Id**. at 607-08 (emphasis in original).

- 14 -

As applied to the present case, we fail to find any facts in the record suggesting that the covered properties required these necessary actions or repairs in order to trigger coverage under the policies. *See id*. at 608. The only losses that Penn sustained were economic losses because the government-ordered COVID-19 shutdown temporarily prevented it from operating its covered properties.[7] *See id*. at 608-09. That temporary closure, however, had nothing to do with the physical attributes of the covered properties, as required by the policies for insurance coverage. *See id*. at 609. Instead, as this Court observed in *Macmiles*, the closures were meant to eliminate the possibility of infected patrons spreading an airborne illness to uninfected patrons. *See Macmiles*, 286 A.3d at 338. Moreover, as this Court further explained in *Macmiles*, "where the alleged property damage is invisible (as is the possible presence of Covid-19 on surfaces), it does not qualify as physical damage for purposes of a commercial property insurance policy." *Id*. at 340. Thus, as we discern no error or abuse of discretion by

---

[7] Indeed, in its claims to the Insurers, Penn listed only its business income losses due to facility closures and costs for COVID-19 related supplies (*i.e.*, gloves, masks, antibacterial wipes, and plexiglass). Penn submitted no claims for repairs for physical damage to any of its properties. We additionally note that improvements to property in response to COVID-19 do not constitute repairs. *See Ungarean*, 323 A.3d at 609 (rejecting the rationale that the installation of partitions, additional handwashing/sanitization stations, and the installation or renovation of ventilation systems would constitute repairing, rebuilding, or replacing the subject property). The High Court instead ruled that "[a]dding **new** installations that do not correct a physical attribute of the property does not constitute repairing, rebuilding, or replacing the **existing** property as a result of a physical loss or damage." *Id*. (emphasis in original).

the trial court in granting the Insurers' motion for summary judgment on the basis that Penn did not establish that it sustained "direct physical loss or damage to any of its properties, we find no merit to Penn's initial issue.

In its next issue, Penn contends that the trial court erred by concluding that the GCB orders did not trigger coverage under the GCB endorsement that was included in certain of Penn's policies. Penn directs this Court to the language of the GCB endorsement, which provides:

> This Policy covers the Actual Loss Sustained by the Insured during the PERIOD OF LIABILITY due to the necessary interruption of the Insured's business due to an order of the gaming or racing control board commission or similar authority that prohibits access to the Insured Location and (i) provided such order is made because of or *in anticipation of* physical loss or damage of the type insured against under this Policy, (ii) *regardless of whether physical loss or damage actually occurs at the Insured Location*, (iii) This policy shall cover the period of time starting at the time such order is issued *and ending when the business is made ready for operations under the same or equivalent physical and operating conditions that existed prior to the order*.

Penn's Supplemental Brief at 3 (*quoting* Policy, Section C(3)(J)) (emphasis supplied by Penn).

Penn claims that, unlike the policy language at issue in *Ungarean*, the GCB endorsement did not require actual physical loss or damage to trigger coverage and did not reference a period of restoration that required repair or replacement of property. Rather, Penn asserts, the GCB endorsement is "triggered by orders issued as a result of actual or *anticipated* physical loss or damage." Penn's Supplemental Brief at 29. Penn claims that "the GCB orders were issued in anticipation of the physical loss of Penn's property – that

- 16 -

is, the inability to use the property safely because of COVID-19." Penn's Brief at 32. Penn points out that there is no requirement in the GCB endorsement that the anticipation be ultimately correct about whether physical loss or damage actually occurred. Penn's Supplemental Brief at 33. While Penn submits that even if the GCB orders did not anticipate property damage, the GCB endorsement was still triggered because Penn "was forced to close its operations to comply with government and GCB orders that were based on real anticipated fears, and the corresponding loss Penn suffered is the same, whether or not those fears ultimately proved correct." *Id*.

Penn additionally argues that the GCB endorsement includes "period of liability" language that does not require repair or replacement of lost or damaged property, and the *Ungarean* decision did not address this "period of liability" wording. According to Penn, unlike the policy in *Ungarean*, the "period of liability" for GCB coverage states, in Clause (iii), that it "start[s] at the time such order is issued and end[s] when the business is made ready for operations under the same or equivalent physical and *operating conditions* that existed prior to the order." *Id*. at 30 (emphasis supplied by Penn). Penn contends that this language is tied to restoration of normal business operations, not repair of property, and nothing in the GCB coverage requires an interpretation of the insurance agreement that limits coverage to actual physical alteration (or, indeed, to any alteration at all) of property, necessitating repair or replacement. *Id*.

The trial court considered Penn's issue and concluded that no coverage was provided by the GCB endorsement because "the policy's declarations plainly state the policy only covers 'direct physical loss or damage' to the insured property and **each type of coverage reiterates this requirement**." Trial Court Opinion, 4/8/24, at 4 (emphasis added, footnote and unnecessary capitalization omitted). The trial court reasoned that, "because the policy requires 'direct physical loss or damage' to the insured property to trigger coverage, including the . . . Gaming Control Board Coverage, [Penn's] motion for partial summary judgment [is] denied." **Id**. at 6 (footnote and unnecessary capitalization omitted).

Based on our review, we discern no error or abuse of discretion by the trial court in reaching its determination that Penn was not entitled to coverage under the GCB endorsement. In advancing its arguments, Penn ignores the key language included in the GCB endorsement which requires that the GCB order prohibiting access to the covered properties must be made because of or in anticipation of "**physical loss or damage of the type insured against under this Policy**." Policy, Section 1(A), at 4 of 89 (emphasis added). This language is critical, as it requires that the order be issued because of or in anticipation of the type of physical loss or damage that the policies insure against. Stated differently, when the policies use the phrase "physical loss or damage of the type insured against under this policy," the policy is referring to the threshold coverage requirement of "direct physical loss or damage to

insured property." In this regard, as explained above, our Supreme Court has ruled that such "direct physical loss or damage" to covered properties means "either (1) a physical disappearance, partial or complete deterioration, or absence of a physical capability or function of the property (loss), or (2) a **physical** harm or injury to the property (damage)." ***Ungarean***, 323 A.3d at 607-08 (emphasis in original). On the record before us, Penn has not established that the GCB orders were issued because of or in anticipation of this type of damage. Accordingly, we find no merit to Penn's GCB endorsement issue.

In its next issue, Penn similarly contends that the trial court erred by holding that no coverage was provided by the Time-Element loss provision included in the policies, which provides:

> This Policy insures TIME ELEMENT loss, as provided in the TIME ELEMENT COVERAGES, **_directly resulting from physical loss or damage of the type insured by this Policy_** . . ..

Policy, Section C(1)(A), at 43 of 89 (unnecessary capitalization omitted, emphasis added).

Penn asserts that a reasonable reading of "loss" in the context of the Time-Element provision must include the inability to use property (as through the loss of a license or because of theft) and the loss of conditions beneficial to operations (as in "Loss of Attraction"). Penn's Brief at 40. Penn argues that this Court must give "loss" and "damage" separate meanings, such that "loss" cannot be construed to mean "damage" or "destruction." ***Id***. at 41.

Penn contends that the trial court's interpretation of "direct physical loss or damage" to mean that coverage is not triggered unless property is structurally altered or damaged, would render as redundant many exclusions in the policies.

As explained above, the trial court concluded that no coverage was provided by any endorsement because "the policy's declarations plainly state the policy only covers 'direct physical loss or damage' to the insured property and **each type of coverage reiterates this requirement**."  Trial Court Opinion, 4/8/24, at 4 (emphasis added, footnote and unnecessary capitalization omitted).

Based on our review, we discern no error or abuse of discretion by the trial court in reaching its determination that Penn was not entitled to coverage under the Time-Element coverage provision.  In presenting its arguments, Penn again ignores the key language included in the Time-Element provision, which requires that the loss for which the insured seeks coverage be "***directly resulting from physical loss or damage of the type insured by this policy***."  Policy, Section C(1)(A), at 43 of 89 (unnecessary capitalization omitted, emphasis added).  On the record before us, Penn has not established that its economic losses directly resulted from the type of physical loss or damage that the policies insure against, *i.e.*, "either (1) a physical disappearance, partial or complete deterioration, or absence of a physical capability or function of the property (loss), or (2) a ***physical*** harm or injury

- 20 -

to the property (damage)." ***Ungarean***, 323 A.3d at 607-08 (emphasis in original). Accordingly, we find no merit to Penn's Time-Element loss issue.

In its next issue, Penn contends that the trial court erred by denying its motion for partial summary judgment regarding the non-application of certain policy exclusions; namely, the contamination exclusion, the interruption of business/loss of use exclusion, and the law or ordinance exclusion. Penn summarily argues that this Court should rule as a matter of law that these exclusions do not apply to its Time-Element claims as a matter of law. ***See*** Penn's Brief at 50.

Initially, we note that Penn has not developed this issue by providing the specific language of any of these exclusions, or discussing such language in the context of relevant decisional law. ***See*** Pa.R.A.P. 2119(a). Rule 2119 requires an appellant's brief to present an argument for each issue on appeal which includes references to the certified record and a discussion of and citation to pertinent legal authority. ***See id***. "Where an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived." ***B.S.G. v. D.M.C.***, 255 A.3d 528, 535 (Pa. Super. 2021). Moreover, Penn does not advance any argument within its briefs as to why those exclusions would not apply, and candidly admits that it "does not address in depth its argument on these exclusions." Penn's Brief at 50 n.22.

Accordingly, as Penn has failed to develop this issue in any meaningful fashion, we deem the issue waived. **See id**.

In its next issue, Penn contends that the trial court erred by granting the motions for summary judgment filed by IFCC and ACE for reformation of their policies. It has long been the law that courts of equity have the power to reform a written instrument where there has been a showing of fraud, accident, or mistake. **See Zurich Am. Ins. Co. v. O'Hanlon**, 968 A.2d 765, 770 (Pa. Super 2009). Mutual mistake will afford a basis for reforming a contract, and exists "where both parties to a contract [are] mistaken as to existing facts at the time of execution." **Id**. (citation omitted). "Moreover, to obtain reformation of a contract because of mutual mistake, the moving party is required to show the existence of the mutual mistake by evidence that is clear, precise and convincing." **Id**. (citation omitted).

According to Penn, when the final versions of the policies were delivered to it on May 28, 2020, Penn was repeatedly assured that its policies had "been reviewed for accuracy" and that "[n]o further corrections are required." Penn's Brief at 53. Penn asserts that IFCC's policy, as inspected and signed by its underwriter, assured Penn: "We trust that this policy meets with the specifications outlined in our quotation." **Id**. Penn claims that it was reasonable for it to believe that the Insurers had thoroughly checked the draft policies and made any corrections needed to the final versions. **Id**. Penn points out that neither IFCC nor ACE presented any evidence from any Penn

witness that there was any mistake concerning the applicable sublimit for their respective communicable disease endorsements. Penn contends that any purported mistake was not mutual because the mistake, if any, made in the issuance of the policy was the careless and negligent act of the agents or employees of IFCC and ACE and not of Penn. According to Penn, IFCC noticed that the communicable disease endorsement did not contain a sublimit prior to the policies' execution, and its failure to change the endorsement's terms prior to issuance should be held as its assent to providing communicable disease coverage per the terms in the policies as delivered to Penn. Penn argues that summary judgment should not have been granted in favor of IFCC and ACE because they did not present clear, precise and convincing evidence that both they and Penn were mistaken on existing facts about the policies.

The trial court considered Penn's issue regarding reformation of the insurance policies issued by IFCC and ACE and determined that the issue was meritless. The trial court reasoned:

> [IFCC and Ace] seek reformation on policies issued to [Penn] based on a transcription error in which the sublimits for communicable disease and crisis management coverages, while negotiated to be $5,000,000 and confirmed as such in the relevant insurance quotes and binders, appeared as "$" in the policies.
>
> Reformation of an insurance contract is allowed when the policy is based on mutual mistake caused by a scrivener's error. The mutual mistake must be established by clear and convincing evidence that the error was contrary to both parties' intent. Here, [IFCC and Ace] have met their burden. Both the terms of the quote and the binder had $5,000,000 sublimits for both the communicable disease and crisis management coverages. Additionally, the policy for the prior year contained the identical

sublimits. [Penn] wanted to keep their premiums manageable and [it] ha[s] provided no evidence regarding discussions about raising the sublimit on those coverages or removing the sublimits completely. Based on the evidence, this was clearly a scrivener's error and [IFCC and Ace] are therefore entitled to summary judgment on their reformation counterclaims.

Trial Court Opinion, 4/8/24, at 6-7 (footnotes and unnecessary capitalization omitted).

Based on our review, we discern no error by the trial court in granting the motions for summary judgment filed by IFCC and ACE on their counterclaims for reformation of their policies. As explained above, where the non-moving party bears the burden of proof on an issue, it may not merely rely on its pleadings or answers in order to survive summary judgment. *See* *Dooner*, 189 A.3d at 482 (holding that the failure of the nonmoving party to adduce sufficient evidence on an issue essential to its case and on which it bears the burden of proof establishes the entitlement of the moving party to judgment as a matter of law). Thus, in order to withstand the motions for summary judgment filed by IFCC and ACE, Penn was required to present sufficient evidence that there was no mutual mistake. Here, Penn fell far short of that mark. Rather than presenting evidence that the absence of any sublimits for communicable disease and crisis management coverages in the final policy was deliberate, intended, and/or specifically negotiated and agreed to between the parties, Penn merely argues that IFCC and ACE should have discovered the mistake before the policies were issued and, therefore, they should singularly bear the burden of the mistake. IFCC and ACE, on the other

hand, presented clear and convincing evidence from which the trial court could determine that there was, in fact, a mutual mistake in the issuance of the final policy. Specifically, they presented evidence that the terms of the insurance quote and the insurance binder reflected sublimits of $5,000,000 for both the communicable disease and crisis management coverages. They also presented evidence that the policies issued for the prior year contained the identical $5,000,000 sublimits for both the communicable disease and crisis management coverages. Thus, as we discern no error or abuse of discretion by the trial court in granting the motions for summary judgment filed by IFCC and ACE on their counterclaims for reformation of their policies, we find no merit to this issue.

In its final issue, Penn challenges the trial court's orders granting Zurich's motion to deem as admitted certain of its requests for admission. We review an order relating to discovery for an abuse of discretion. *See Kuwait & Gulf Link Transport C. v. Doe*, 92 A.3d 41, 44 (Pa. Super. 2014). Where the court's decision implicates a question of law, our scope of review is plenary, and our standard of review is *de novo*. *See id*. at 44-45. As this matter involves the trial court's application of Pa.R.C.P. 4014, we set forth that rule's salient provisions:

> (a) A party may serve upon any other party a written request for the admission, for purposes of the pending action only, of the truth of any matters within the scope of Rules 4003.1 through 4003.5 inclusive set forth in the request that relate to statements or opinions of fact or the application of law to fact . . ..

(b) Each matter of which an admission is requested shall be separately set forth . . . If objection is made, the reasons therefor shall be stated. The answer shall admit or deny the matter or set forth in detail the reasons why the answering party cannot truthfully do so. A denial shall fairly meet the substance of the requested admission, and when good faith requires that a party qualify the answer or deny only a part of the matter of which an admission is requested, the party shall specify so much of it as is true and qualify or deny the remainder. An answering party may not give lack of information or knowledge as a reason for failure to admit or deny unless the answering party states that he or she has made reasonable inquiry and that the information known or readily obtainable by him or her is insufficient to enable him or her to admit or deny. . . ..

(c) . . . If the court determines that an answer does not comply with the requirements of this rule, it may order either that the matter is admitted or that an amended answer be served. . . ..

(d) Any matter admitted under this rule is conclusively established unless the court on motion permits withdrawal or amendment of the admission. . . ..

Pa.R.C.P. 4014.

The purpose of this discovery tool is "to clarify and simplify the issues raised in prior pleadings in order to expedite the litigation process. **See Christian v. Pennsylvania Financial Responsibility Assigned Claims Plan**, 686 A.2d 1, 5 (Pa. Super. 1996). Requests for admission must call for matters of fact rather than legal opinions and conclusions, as conclusions of law are not within the permissible scope of requests for admissions. **See id**.

Penn contends that the trial court abused its discretion by deeming as admitted more than twenty of Zurich's requests for admission. Penn maintains that the requests "largely sought legal conclusions or were otherwise properly responded to by Penn." Penn's brief at 56. Penn initially

- 26 -

points to requests 36-38, which asked Penn to admit that its insurance broker was its "agent," "agent for purposes of obtaining insurance policies or coverage agent for specific purposes," and contends that these requests sought a legal conclusion because the question of whether an agency relationship exists is a legal question. *Id*.

Penn next points to requests 52 and 53, which asked Penn to admit that when it reopened its insured locations to patrons, some of its employees "elected not to come to work," and "elected not to come to work due to the risk of catching or spreading COVID-19." *Id*. at 56-57. Penn argues that these requests sought admissions regarding the mental state, thought process, and/or intentionality of employees who did not come to work, and claims that whether employees voluntarily elected to not come to work is a legal conclusion. *See id*. at 57.

Penn then points to request 69, which asked Penn to admit that its "financial obligations for leasing certain games or machines were reduced while those games or machines were turned off." *Id*. According to Penn, this request improperly sought a legal conclusion regarding the interpretation of multiple contracts and financial records, which is a legal conclusion.

With respect to requests 72-80, Penn indicates that each of these requests asked Penn to admit that it or its employees, staff, and vendors could "access" its insured locations during the period during which such locations were closed to patrons. *Id*. at 58. Penn argues that these requests

improperly sought legal conclusions regarding the interpretation of "access," and were not within the permissible scope of requests for admissions under Rule 4014.

Penn next points to requests 81 and 82, which asked Penn to admit that, when its insured locations were closed, it "earned a revenue as a result of online betting or gambling." *Id*. at 59. Penn claims that it answered these requests with the relevant facts, including referring to documents it produced and the expert report of its forensic accountant, and its answers complied with Rule 4014(b).

Finally, Penn points to requests 88 and 90, which asked Penn to admit that it was not obligated by a court or government order "to continue to pay its employees, including furloughed employees, through March 31, 2020," or "to pay for and provide Employment Benefits to furloughed employees through June 30, 2020." *Id*. Penn submits that it responded that it was not aware of a court or government order responsive to these requests, and that its response complied with Rule 4014.

The trial court considered Penn's final issue and determined that it lacked merit. The court reasoned:

> Penn also appeals this court's orders from September 7, 2023[,] and October 11, 2023[,] in which the court deemed admitted . . .Zurich['s] . . . requests for admission . . . 36-38, 52-53, 57-60, 69-82, and 87-90. While the court granted [Zurich's] motion based on [Penn's] repeated discovery deficiencies and was within its authority to deem the enumerated [requests] admitted pursuant to [Rule] 4014(c), those admissions were immaterial to the court's rulings on th[e summary judgment] motions.

Trial Court Opinion, 4/8/24, at 7 n.24 (unnecessary capitalization omitted).

Based on the trial court's explanation, we need not reach the merits of Penn's final issue because, even if the trial court erred by deeming the requests admitted, the error was harmless. ***See Bensinger v. Univ. of Pittsburgh Med. Ctr.***, 98 A.3d 672, 683 n.12 (Pa. Super. 2014) (holding that an error is harmless if the court determines that the error could not have contributed to the verdict); ***see also Drew v. Work***, 95 A.3d 324, 337 (Pa. Super. 2014) (holding that an error is harmless if a party does not suffer prejudice as a result of the error). Here, the trial court indicated that it did not rely on the subject admissions in deciding the various motions for summary judgment. Given the subject matter and content of the requests for admission, we fail to see how they could have contributed in any manner to the trial court's rulings on the various motions for summary judgment. Accordingly, as the trial court's discovery rulings did not contribute to its decision to grant the Insurers' motions for summary judgment, or its decision to deny Penn's motions for partial summary judgment, we conclude that any error by the court in deeming the requests admitted was harmless. Thus, Penn's final issue merits no relief.

Having found no merit to any of Penn's issues, we affirm the orders in question.

Orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: <u>5/7/2025</u>